# OCTOBER TERM, 1859, AT DETROIT.

## Myron Gates and Another v. Martinus Shutts.

A *bona fide* claim, with a color of right, although there be in fact, no right, so long as the party asserting it does not know he has no right, and acts in good faith, is sufficient to sustain a compromise.

Where defendant charged complainant with intentionally burning his own mill, and made claim for payment for certain wheat of defendant which had been placed in the mill before it was burned, and complainant gave his note and mortgage for the value of the wheat,—*Held*, on bill filed by complainant to set aside these securities as obtained through threats, fear and duress, that it was not necessary for the court either to find that complainant burned his mill or to grant the relief asked, for the settlement made by the parties must stand if there was no fraud, and no undue advantage taken by defendant to bring it about, and he had reason for believing the charge, and did not manufacture it to frighten complainant into a settlement.

*Heard June 8th and 9th. Decided October 8th.*

Appeal from Wayne Circuit in Chancery.

The bill was filed by Myron Gates and his wife, March 29th, 1856, to set aside a note of $325, given February 20th, 1856, to defendant by complainant Myron, and a mortgage, made by both complainants, to secure said note. These securities the bill alleges, were given for no consideration whatever, and were obtained by fraud, duress and compulsion. The allegations in the bill, and the proof taken, are sufficiently stated in the opinion to illustrate the questions of law involved.

On the hearing in the court below, on pleadings and proofs, the bill was dismissed with costs, and complainants appealed.

*G. V. N. Lothrop* and *Moore & Blackmar* for complainants:

1. Courts of Equity have ever been watchful to protect

parties in entire immunity, from imposition, oppression, duress and undue influence of any kind, in the making of contracts. A review of some cases will serve to show not only the principle, but the extent of the protection thus afforded.

Thus, Equity guards against the exercise of *undue influence* by those in confidential relations, and will set aside contracts, in such cases, where they are improvident and without professional advice.— 14 *Ves.* 287 ; 1 *Ves. Sen.* 276 ; *Ibid.* 19 ; 3 *Madd.* 191 ; 2 *Atk.* 254 ; 7 *Beav.* 551 ; 8 *Beav.* 439 ; 8 *How.* 183.

So where there is great pecuniary distress, which has been taken advantage of. And in these cases, gross inadequacy of price may be regarded as evidence of fraud and imposition.— 1 *Ves.* 218 ; 10 *Ves.* 219 ; 14 *Ves.* 215 ; 3 *Madd.* 417 ; 1 *Cox,* 333 ; 3 *Bro. Ch.* 157 ; 2 *Sch. & Lef.* 35, 214 ; 3 *Bro. P. C.* 560.

And grossly improvident contracts of heirs and young persons, just come into fortunes, have, in a great many instances, been set aside as fraudulent.— 2 *Vern.* 27 ; *Ibid.* 319.

Fraud vitiates all contracts ; fraud is infinite in its forms, and the cases in which Equity has set aside contracts tainted with it are almost infinite.

The fraud may be by misrepresentation or a wrongful suppression.—*Suggestio falsi vel suppressio veri.* — 1 *Story Eq.* §§ 201, 203 ; 1 *P. Wms.* 240 ; 6 *Ves.* 173 ; 5 *Blackf.* 522.

So where a person uses some lawful proceeding or right oppressively.— 1 *Atk.* 409 ; 16 *Pet.* 269 ; 6 *Johns. Ch.* 201 ; 2 *Fost.* 310.

And where the contract is made under the influence of great fear or alarm, or of threats, or under circumstances which constitute a moral duress, though falling short of legal duress, Equity will avoid it. So if the occasion is sudden, the party has no time for suitable deliberation, is mportunately pressed and menaced, is strongly advised by

GATES v. SHUTTS.

persons in whom he confides, and an unconscientious advantage has been taken, Equity relieves. — 1 *Story's Eq.* §§ 239, 251; 1 *Pars. Con.* 319, 320; 16 *Ves.* 157.

2. But the counsel for Shutts contend that conceding the note and first mortgage to have been made under the influence of great alarm and distress, produced by the threats of Shutts, yet that it was confirmed and rendered valid by the execution of the second mortgage.

Let us see what this amounts to.

The trap of the conspirators was sprung late *Saturday* afternoon. On Monday morning following, the note and mortgage were signed by Gates. On Wednesday following, the second mortgage was made. The element of time alone, we think, disposes of this whole position.

The note, given with the mortgage, all parties supposed to be binding; and until Gates got into a position where he could repudiate the whole transaction, he could not, with any show of propriety, refuse to correct what was a mere mistake.

No act will work a confirmation of a fraudulent contract, unless the sufferer does it after the original influence is entirely removed; after he fully understands his rights, and comprehends the full effects of his action. — 1 *Ves.* 215; 1 *Vern.* 237; 2 *Vern.* 121; 2 *Ves.* 281; 2 *Bro. Ch.* 400; 3 *Bro. Ch.* 633; 2 *Sch. & Lef.* 479; 2 *Bro. P. C.* 183; 1 *Wilson*, 320; 4 *Dessaus.* 706; 5 *Blackf.* 509.

*Backus & Harbaugh* on same side:

The liability of Gates as to the wheat was only that of warehouseman, bound to reasonable care. The burden of proof was therefore on Shutts, to establish such want of care as would charge him with the loss of the wheat.

Complainant is entitled to relief on the ground of surprise, mixed up with mistake of law. — *Story's Eq. Juris.* § 151. Though, as a general principle, a mistake of law is not a ground of relief in equity, yet where a mistake of law is

mingled with imposition, misrepresentation, undue influence, misplaced confidence, and surprise, relief will be granted. — 1 *Story Eq. Juris.* §§ 131, 154; 3 *Barb.* 55; 11 *Ohio,* 480, 223; 18 *Ohio,* 548; 6 *Mass.* 506; 1 *Ves.* 43; 16 *Ves.* 157; 10 *Barb.* 438; 3 *Ves.* 447.

Both mortgages were without consideration, legal or moral; which, coupled with the fact of mistake of law and the undue influence used, create such a confirmation of mistake and oppression as entitle complainant to relief. He was under the influence of such a combination of terror, threats and apprehension, to give these securities, that he had no free will; and the well established rule of equity is that where a party is not a free agent the court will protect him. — 1 *Ves.* 215; 2 *Ves.* 497; 6 *Johns. Ch.* 201; *Talbot Cas.* 111; 10 *Pet.* 270; 1 *Atk.* 409; 9 *How.* 81.

*Holbrook & Bishop* for defendant:

1. The Court will not interfere in a compromise where the party knows all the facts, and elects to compromise rather than litigate. — 1 *Story Eq. Juris.* §§ 130, 131; 1 *P. Wms.* 723; 1 *Bibb,* 168; 15 *Vt.* 379; 2 *Paige,* 478; 8 *Ohio,* 372; *Saxton,* 101, 112; 3 *Edw. Ch.* 36; 10 *Leigh,* 436, 445.

2. The giving of the second note and mortgage was a full confirmation of the original agreement to settle, and the court will not interfere. — 1 *Story Eq. Juris.* §§ 345, 306; 1 *Bibb,* 168; 3 *P. Wms.* 290; 12 *Ves.* 373; 3 *Yerg.* 369; 1 *Pars. Cont.* 361, 363; *and notes x, y, z.*

3. The threat of legal proceedings was justifiable. — 2 *Dev. Eq.* 292; 1 *Ired. Eq.* 207; 8 *Ohio,* 372.

MANNING J.:

The bill states Gates had a mill burnt in 1848, and that Shutts had a quantity of wheat in the mill at the time of the fire: That a few days before the note and mortgage, mentioned in the bill, were executed and delivered, certain persons, among whom was Shutts, designing to

take advantage of Gates, and deprive him of his property, conspired in falsely charging him with having himself procured or caused his mill to be burnt; that they pretended they could bring witnesses to swear to it; and that Shutts, and those with whom he acted (who had like pretended claims) threatened Gates that, unless he immediately paid or secured Shutts for the wheat he had lost, they would publish said charge to the world, and brand him with the alleged crime, and thereby destroy his character, and expose him to great infamy, if not punishment; that Gates was thrown into extreme fear and alarm by such false charges and threats, and fearing false testimony, and that, although innocent, he might be disgraced, and be subjected to great pecuniary loss, if not to criminal prosecution, was thereby induced to give the note and mortgage in question.

There is no proof of a conspiracy or combination to charge Gates with burning the mill, or causing it to be burnt. And the gravamen of the bill, aside from the conspiracy, consists in the publication of the charge, and the disgrace and infamy, if not public prosecution, that Gates feared from the publication. The proof fails here, as well as to the conspiracy.

There is no evidence that Shutts, or any one else, unless Shutts' claim was settled, threatened to publish to the world that Gates burnt the mill, or procured it to be done.

From the evidence, it appears that a short time before the settlement between the parties took place, and the note and mortgage were given, Shutts received information, through one Miller, that led him to suppose Gates had something to do in burning the mill, and that he sent one Congdon to see a man by the name of Crafts in regard to it; and that after Congdon's return he went to see Gates. This was on Saturday, towards night. He and Gates went into a room by themselves, and he then told Gates he must

have pay for his wheat; that he, Gates, burnt the mill; and that he (defendant) "had a sure thing on it." Gates asked time to get counsel. Shutts gave him until Monday morning, but advised him not to get counsel, for his case was a bad one.

On the evening of the next day, which was Sunday, Gates went to consult with one Hedden, a brother-in-law, who then was, or had been, a justice of the peace. Hedden advised him, whether guilty or not of burning the mill, to keep away from Shutts, and told him both the civil and criminal suits were barred by the statute of limitations.

As Gates did not come to Shutts' house on Monday morning, as early as he was expected, Shutts went to Plymouth. Gates came soon after Shutts had gone, and followed on after him. They met at Plymouth, and in the presence of Scattergood agreed on the amount to be paid for the wheat, and the first note and mortgage were given. After their execution and delivery, Gates was informed that Crafts was the person by whom the charge made against him could be proved. On the same day Gates started to see Crafts, leaving word with his family that he should be back in one or two days.

An error having been discovered in the mortgage, Scattergood went in the evening to Gates' house, to see him and have it corrected, but did not find him at home, for he had already gone to see Crafts. This was the evening of the day the mortgage was executed. And the next day, which was Tuesday, Shutts sued out a writ of attachment and had Gates' land attached. On the following day, which was Wednesday, Gates having returned, Shutts was sent for, and a new arrangement was entered into by which the attachment suit was discontinued, and the note and mortgage in question were given.

After the first interview, on Saturday evening, Shutts did not seek any further interview with Gates. He expected, it is true, Gates would call at his house on Monday

GATES v. SHUTTS.

morning. But after waiting for him until he gave up all hopes of seeing him there, instead of going to Gates' house to see him, he went to Plymouth, about his own business, and in all probability with a determination to bring a suit to test Gates' liability for the wheat. And after the attachment suit had been commenced, Gates, or his friends with his assent, sent for Shutts. The two interviews had between them after Saturday evening—and there does not not appear to have been any more—were sought by Gates, and not by Shutts.

If the mill was burnt by Gates, or by his procurement, Shutts should be paid for his wheat; otherwise not. His right to have Gates pay him for the wheat depends on that fact. But it is not necessary for us to find this fact or grant the relief asked; for the parties have themselves settled the only difficulty between them; that is, whether Gates should pay Shutts for the wheat; and that settlement must stand, if there was no fraud, or undue advantage taken by Shutts to bring it about, and he had reason for believing the truth of the charge, and did not manufacture it to frighten Gates into a settlement. A *bona fide* claim, with a color of right, although there be in fact no right, so long as the party asserting it does not know he has no right, and acts in good faith, is sufficient to sustain a compromise; for a party may buy his peace in a case in which he knows there is no right against him.

There would be no such thing as a compromise or settlement of a dispute by the parties if the original controversy was not thereby closed.

So far as the testimony discloses what took place between the parties at the first interview, we see nothing in it to vitiate the first settlement, much less the last. Shutts could not make known to Gates the ground on which he claimed pay for his wheat, without charging him with being concerned in burning the mill. There was nothing then wrong, if he had reason for believing it, in going to Gates' house, and with Gates, into a room by themselves, and charging

him with it, and in threatening to bring a suit for the value of the wheat, unless Gates would pay him for it without.

All we know in regard to what took place at the first interview is in Kinney's testimony. He swears to a conversation he had with Shutts on the 27th February, a week after the last mortgage was given. After giving Shutts' account of it, (the material parts of which we have stated, viz: his going to Gates, taking him into a room, &c.) he says, "I do not know the exact words, but he (Shutts) said in effect, the idea was, that Gates did it" (settled with Shutts) "through fear he would be sent to state prison, believing at the time it had not been outlawed; but when he found it was, he held up his head considerably." Again, Shutts said that "he did not believe Gates ever would have settled it, if he had not been afraid of a criminal prosecution." And again, "did not hear Shutts say that Gates acted under any other fear except the fear of the criminal prosecution, and except that he said Gates did not want it noised about on account of his family." In the same conversation, Shutts said "he believed Gates was guilty as a man could be."

It is to be observed in relation to this testimony :

1st: that it is not a statement of what was done or said at the time, but of Shutts' opinion only of what probably influenced Gates in settling with him.

2d: That that part of Shutts' statement to the witness, viz.: "That Gates did it through fear he would go to the state prison, believing, at the time, it had not been outlawed; but when he found it was, he held up his head considerably;" so far as it relates to the outlawry, if the statement was ever made to the witness, is not true in fact. For Gates went to consult with Hedden on Sunday evening, and Hedden says that, from the commencement of the trouble, he told Gates that both the criminal and civil suits were barred by the statute of limitations : and

3d: Whatever was Shutts' opinion as to the motive that

influenced Gates in settling with him, no inference can be drawn from it that threats of a criminal prosecution were made; more especially, as the bill states nothing of the kind.

The second interview, which was at Starkweather's office, in Plymouth, was brought about by Scattergood, at Gates' request. Scattergood and Starkweather were present. The parties there, after disagreeing as to the quantity of wheat Shutts had in the mill, when it was burnt—Shutts claiming 260 bushels, and Gates stating there was not so much—finally agreed on the amount and price, after something had been thrown off by Shutts. And a note and mortgage for the amount were then, at Gates' request, drawn by Starkweather, who, also at Gates' request, went to the house of the latter to take the acknowledgment of-Mrs. Gates. Shutts did not go. But Scattergood, who had business with Gates, and was going there, was to receive the note and mortgage for Shutts, and did so; and after the error in the mortgage, which we have already mentioned, was discovered, Scattergood and Starkweather went back to Gates' house to have it corrected, and were informed Gates had been called away suddenly from home, and that he expected to be absent two or three days. He had then gone to see Crafts, as the testimony shows. The attachment suit was then commenced by Shutts.

Previous to the interview in Starkweather's office, Scattergood, who is Gates' witness, represents Gates as overcome with fear. He says, "Mr. Gates, when he was in conversation with me on this subject, at the store, appeared to be more frightened than I ever saw a man. I was alarmed myself lest he should faint away." Why this fear? We shall state the circumstances, and leave them to speak for themselves without comment.

Shutts was not present at the time, and there is no evidence Gates had seen Shutts since the preceding Saturday evening. At the interview on that evening, Shutts had given

him until the next Monday morning for an answer. As already stated, Shutts, after waiting a reasonable time on Monday morning, started for Plymouth, and Gates, calling soon after, and learning whither he had gone, followed on after him. He meets Scattergood, who asks him which way he is going. He replies: to Noyes' (Shutts was at Noyes'). Scattergood said he wished to see him at his store before he went home. Gates asked what for? Scattergood told him. He said he would go to the store then. Scattergood told him he had better go and see Shutts at once; that Shutts was at Noyes': That Shutts was going to Detroit, and might make him a great deal of trouble. Gates turned and went with Scattergood to the store, where he was seized with the paroxysm of fear described by Mr. Scattergood in his testimony. After he had recovered from it, Scattergood again told him that he had better go and see Shutts, for he was going to Detroit, and might make him a good deal of trouble. He replied he would not go and see him, and requested Scattergood to go. Scattergood started out for that purpose, and met Shutts near the store door, who, at Scattergood's request, went into Starkweather's office, and remained there until Gates and Scattergood came in, when the settlement we have mentioned took place.

Without undertaking to account for the scene of terror and alarm in Scattergood's store, the testimony shows that Gates was not unmanned in the presence of Shutts, for they disagreed about the quantity of wheat, as we have already stated, and Starkweather discovered nothing but a common business transaction in what transpired on that occasion. He says: "Gates did not seem frightened. It seemed to be business done in the ordinary way. I did not notice anything peculiar in the appearance of Mr. Gates." Starkweather had not at that time heard of the rumor charging Gates with burning the mill. He, of course, was not on the lookout to see what effect, if any, the rumor had on Gates. Whatever its effect, it was not on that

occasion sufficiently marked to challenge the notice of one not expecting something of the kind.

Scattergood further says: "At the execution of the first mortgage at Gates' house, he appeared calm and cool. I did not at that time notice any excitement." It clearly appears nothing was said at the interview in Starkweather's office about Gates burning the mill. Starkweather says: "At the time of the execution of the first mortgage, the rumor about Gates burning the mill had not reached me. After the execution of the first mortgage, I heard of it." Scattergood says: "Mr. Shutts did not to me, nor in my presence, at that time, charge Gates with burning the mill. I can not say that Shutts ever told me that Gates burned the mill."

It appears from Scattergood's testimony that Shutts requested him not to mention the name of the witness (by whom the burning of the mill was to be proved), to Gates, until after the mortgage was executed. Scattergood learned from rumor that Crafts was the witness. He says he had been absent from Plymouth until Friday or Saturday evening before, and that on his return there was a rumor "that Crafts had made a statement that Gates had burnt the mill." Shutts did not tell him who the witness was, for he says, "Shutts must have known that I knew the witness relied upon by Shutts was James Crafts." Gates asked Scattergood who the witness was, and he refused to tell him, saying he had given his word to Shutts not to do so before the mortgage was executed. This request and promise must have been made after the agreement for a settlement in Starkweather's office, and before the mortgage was executed at Gates' house. After the execution of the mortgage, Scattergood told Gates that Crafts was the witness.

Gates started the same evening to see Crafts, and after his return, Shutts was sent for by him, or with his assent, and the second note and mortgage were given in lieu of the first, and the attachment suit was discontinued. Before the

7 MICH.—K.

second mortgage was executed, Hedden, of his own accord, went to see Congdon, and afterwards informed Gates of what Congdon had said in regard to his interview with Crafts, and thereupon Hedden advised Gates to execute the second mortgage. Gates said there was no truth in Congdon's statement; that Crafts had told him he never said so, and that he denied the whole story of the burning of the mill. Shutts had made no proposition for a second mortgage. It was not known, when he was sent for, that he would accept it, and discontinue the attachment. Gates, or Hedden, and not Shutts, sent for Starkweather to come and draw the mortgage, and take the acknowledgment. There is no pretence Gates did not know what he was doing, or that he was induced to execute the note and mortgage through any undue or improper influence. If he was influenced at all in what he then did, it was by his friends, and not by anything said or done by Shutts.

We see no reason, from the testimony, for believing Shutts did not, from the first, act in good faith, and with the sole view of getting pay for his wheat, to which he believed himself justly and equitably entitled. The decree must be affirmed with costs.

MARTIN Ch. J., and CHRISTIANCY J. concurred.

CAMPBELL J. did not sit in this case, having been of counsel.